**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------

UNITED STATES OF AMERICA

                                CASE # 25-MJ-127

      -against-

MAX FISHKIND,

                  Defendant.

------------------------------------------------------------

### *FTR TRANSCRIPT – DETENTION HEARING PROCEEDINGS*


**B E F O R E:**          **HONORABLE DANIEL J. STEWART**
                         James T. Foley Courthouse
                         445 Broadway
                         Albany, New York  12207


**A P P E A R A N C E S:**


                         **OFFICE OF THE UNITED STATES ATTORNEY**
                         **NORTHERN DISTRICT OF NEW YORK**
                         For the Government
                         James T. Foley Courthouse
                         445 Broadway
                         Albany, New York  12207
                         BY: BENJAMIN CLARK, ESQ.
                             Assistant United States Attorney


                         **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
                         **NORTHERN DISTRICT OF NEW YORK**
                         For the Defendant
                         54 State Street, Suite 310
                         Albany, New York  12207
                         BY: EMMA REYNOLDS, ESQ.
                             Assistant Federal Public Defender


**D A T E:**                     **May 5, 2025**

*JACQUELYN BURKE GECEWICZ, OFFICIAL UNITED STATES COURT REPORTER*
*James T. Foley Courthouse,  445 Broadway,  Albany,  New York  12207*
*(518) 257-1894*

*P R O C E E D I N G S*:

*(FTR proceedings continued as follows:)*

MS. REYNOLDS: Your Honor, Emma Reynolds on behalf of Mr. Fishkin.

THE COURT:  All right.  Good afternoon to you, Ms. Reynolds.

Mr. Fishkin, good afternoon to you.

THE DEFENDANT:  Good afternoon, Your Honor.

THE COURT:  All right.  So we are here today for purposes of a bail hearing at the request of the defendant.

And the government's position is still seeking detention; is that correct?

MR. CLARK:  That is correct, Judge.

THE COURT:  All right.  Let me just ask you, under the Crime Victim's Right Act, any victim of the offense has the right to notice of any public court proceeding involving the crime of the accused and to attend that proceeding.  Are there any victims, and, if so, has the government fulfilled its obligation to notify them of this proceeding?

MR. CLARK:  There are victims and the government has.

THE COURT:  All right.  Do they wish to be heard?

MR. CLARK:  They do not.

THE COURT:  Okay.  All right.  So, Mr. Fishkind, let me just talk to you a little bit about what this process

is.  I know your counsel has probably explained it to you in some detail, but I'll just state it for the record.  While we don't have a court reporter today, these proceedings are being recorded on our FTR system, so, if necessary to create a transcript, we can do that.

So, first, what I want to tell you is when we originally met, I told you that you were presumed to be innocent of this charge.  What I want to emphasize to you is that continues.  It will continue through today up until the point of any verdict that's reached in this case.  Nothing that takes place at this hearing is meant to or should be construed to affect that presumption in any way.  So what that means is whether I have you detained or I release you, if you proceed to trial, you're going to be presumed to be innocent, as it is the government's burden to prove the case against you.

Second, under the Bail Reform Act, which governs my conduct here today, I'm instructed to release you prior to trial, unless I find that there are no conditions or combination of conditions that exist which will reasonably assure your appearance; that would reasonably assure the safety of any person in the community.  In doing that, I'm directed to impose the least restrictive conditions to have those assurances, and only in a circumstance which I felt like there were no conditions I could impose which would

reasonably assure either your appearance or the safety of the public, would I then have you confined until trial.

In making that determination, I have to consider four things.  I have to consider the nature and circumstances of the alleged offense, I have to consider the weight of the evidence against you, your history and characteristics, the nature and seriousness of the danger to others or to the community.  Those are the four factors.  In addition, there are cases, which this may well be one, where there is a presumption in favor of detention; in this particular case, because the allegation is there is a minor victim.  In those cases, that presumption can be overcome by the burden of production by your counsel.  Even where it is overcome, I still consider it as part of my deliberations, because it's an indication by Congress that there's certain cases of which pre-trial detention should be imposed.

It's the government's burden in this case.  I will have the government go first.

MR. CLARK:  Thank you, Your Honor.  The government is of the position that the defendant poses an irremediable risk of danger to the community and that there are no conditions or set of conditions that the Court could impose that would reasonably assure the Court of the safety of the community.  I also believe that he poses a flight risk and that there are no conditions that can be set to reasonably

assure the Court of his return to court.  But our primary contention is on dangerousness to the community.

So turning to the factors that the Court must look at in a situation like this.  First, the nature of the offense.  Your Honor, this case stems from really a period of at least three years of Snapchat conversations that the defendant was having with minors, inducing them to send him masturbation videos.  Through a warrant on the defendant's Snapchat account, the FBI uncovered dozens of masturbation videos that are age indeterminate.  The defendant, in two interviews with the FBI, admitted that he was inducing and coercing minors to send him masturbation videos, that he got off on it, that he's sexually attracted to minors, that he's been in treatment for that for sometime prior to this, all of this -- and during this conduct.

So it's -- the nature of the offense is particularly concerning to the government.  I believe if you look at the characteristics of this defendant, he's diagnosed with autism.  While that may be a factor that may ameliorate perhaps an ultimate sentence, should he be convicted, that might be imposed upon him, I don't -- I don't believe that his autism diagnosis gives us any more comfort in letting him out.  The CDC publishes the following diagnostic excerpts on its website for autism, stating that those with autism have deficits in social and emotional reciprocity, reduced

emotions, deficits in developing, maintaining, and understanding relationships, highly restricted fixated interests that are abnormal in intensity or focus, and excessively perseverative interests.  I think the defendant has demonstrated all of those throughout his conduct over the past three years, as he's admitted to the FBI in coercing minors into sending masturbation videos to him.

Now, the charges here relate to one particular victim, and as is set forth in the sworn complaint, there is another prior victim from 2021 in the Maryland area.  Part of the difficulty here is that because these videos came over Snapchat, it's very difficult to identify whether the -- who the sender is and then to identify from the nature of the content, because these are pubescent minors, whether they are, in fact, minors or if they're adults.  But I will say that the defendant admitted to the FBI twice that he has for several years engaged in Snapchat conversations aimed at coercing minors to send him -- to produce and send him child pornography.  He's coached them on how to make the videos and has had them sent to him.

So for purposes of this hearing, I'm just going to relate the fact that he's admitted to doing this multiple times, that there are videos that are consistent with that in his Snapchat account, potentially dozens of individual victims over this three-year period, but I really want to

focus on our identified victim and then the prior victim, because that relates really to the ultimate sentence that he faces here, which drives me --

Oh, another concern that the government has -- so he was being treated for pedophilia.  It's not stated in the -- it's stated in the PSIR that he's undergone therapy over the past couple of years.  He said that that therapy was for his pedophilia, so he was engaged in therapy --

MS. REYNOLDS:  Well --

MR. CLARK:  -- while he was -- this is what his admission was to the FBI.

THE COURT:  Why don't we approach.

(Sidebar conference off the record.)

MR. CLARK:  So that is concerning, that he was engaging in this conduct while he says to the FBI that he was in treatment for his pedophilia, so the treatment was obviously not working.  The government is also concerned about the fact that as set forth in the Pre-trial Services Report, his father states that he has all of the -- controls all of the safeguards for the Internet within the home in their numerous Internet-capable devices there.  There was obviously some sort of snafu with that control because the defendant, for the past three years, has been engaging in this kind of conduct through Snapchat.  So the government is concerned about the ability to monitor the defendant, if

he's -- if he's released to the home with all of these Internet devices.  It obviously wasn't working, what they had in place, despite the fact that the father, it appears, asserted to Probation that he controlled all of the Internet safeguards in the house.

So turning now to the final factors, the weight of the evidence and the nature and seriousness of the danger to the community.  I think I have spoken on that last one sufficiently, but with respect to the weight of the evidence, this is a case where the defendant has admitted to the misconduct or the crime in a recorded interview, not once but twice actually.  He has admitted to the prior victims, which subjects him to a pattern enhancement under the Guidelines. So with respect to the weight of the evidence, it's, frankly, overwhelming.

We also have a very cooperative minor victim on this case, as well as the prior minor, so I have no doubt that we would obtain that pattern enhancement, which would put the defendant in a Guideline range of 324 months to life with his criminal history category of one, if he's convicted after trial, and a range of 235 to 293 months, if he takes a plea and gets a three-point reduction for that.  So he's facing an incredibly staggeringly high Guideline sentence with, frankly, a certainty of conviction on the evidence that we have.

So for all of those reasons, the government is of the belief that he poses an irremediable danger to the community.  The sentence that he's facing makes him a flight risk, notwithstanding his parental ties to the community and, therefore, we believe that there are no conditions the Court can set to reasonably assure the Court of the safety of the community or his return to court.  Thank you.

THE COURT:  All right.  Thank you, Mr. Clark.

All right.  Emma?

MS. REYNOLDS:  Yes, Your Honor.  So, first of all, I do think that the defense has rebut the presumption in this case of detention.  Max lives with his parents in the Northern District of New York.  While his residence in the Northern District of New York has not been long, it's been about two years.  His mother and father, who are his main support, have moved kind of whole stock to New Paltz, New York.  Additionally, he does have family that is in the northeast as well.  So I do believe we have rebutted the presumption in terms of community ties.

Additionally, Max was working locally.  My understanding is I do believe that he has -- I believe that he has resigned from that job, so I don't think that that's at this point an option for him.  However, he was working in the community.

With respects to his detention, I do think that Your

Honor does have available conditions that you could set that would reasonably assure, one, his appearance at court.  What I can say is Max doesn't have anywhere to go and he doesn't have the resources to go there, and so I do think --

THE COURT:  I'm not that concerned about his risk of flight.

MS. REYNOLDS:  Very well.

THE COURT: I think with his family connections and everything, conditions could be effective as to that.  I am deeply concerned with regard to the danger issue.

MS. REYNOLDS: Very much understood, Your Honor, so I'll address that.  Just to clarify, I don't believe that his family, Max's family, had set any sort of Internet restrictions prior to the arrest in this case.  So I think that the government's assertion that there were previous restrictions with respect to Internet and Max's access to it, or his level of privacy in accessing the Internet, I don't think that there were any restrictions previously.  So his family -- while his family is -- does have a lot of Internet-capable devices -- I don't think that there is families out there that don't have many, many Internet-capable devices these days.  What is a little bit unique is his family's, one, ability to and willingness to limit his access to the Internet, but also the advance capabilities and knowledge that Dr. Fishkind has.  I will

note, Your Honor, that he is here in court and would be available to answer questions, if Your Honor had them, of him specifically.  However, I do think he has also said that he would also hire an expert in order to limit the Internet capabilities in order to make sure that Max was limited in terms of any Internet capabilities, while his wife, who is also a doctor, may need some access to that as well.

Dr. Fishkind currently works out of the home.  He's willing to transfer as many days to working remotely as possible so he's able to be home monitoring Max.  He -- and I think he's willing, and I would proffer him potentially as a custodian for the Court, so that would be an extra set of eyes, a vigilant set of eyes, on Mr. Fishkind and his compliance with Your Honor's order.  So I do think this is a little bit unique in the sense that I think that the family's abilities and capabilities with respect to monitoring Max and his ability to access the Internet is unique.

I will note -- and, again, I don't have -- I just have the complaint in this case.  I don't have anything else beyond the complaint.  So my understanding is I don't believe that there were any overtures to meet any individuals in person.  Additionally, I don't believe that there were -- beyond the communications between these alleged minors and Mr. Fishkind, I don't believe that any of the videos of the alleged minors would have been sent out to other individuals

not party to the A and B conversation via Snapchat.

So what I can say is, I do think that this is a little bit unique in the ability of the Court to set conditions.  Thank you.

THE COURT:  Okay.  Thank you very much.

Mr. Clark, anything further?

MR. CLARK: No, thank you, Judge.

THE COURT:  All right.  So just as a procedural matter, I guess, Ms. Reynolds, I did receive and review the Pre-trial Services Report, and I know that you have spoken as to a number of issues.  Is there any dispute that you have as to the factual content of the report?

MS. REYNOLDS: No, Your Honor.

THE COURT:  So as I go through this, I think we can agree on a couple of things.  First of all, it's a presumption case, so there is a presumption in favor of detention.  People do not dispute that.  With regard to his lack of criminal history, family support, both financial and emotional that the family can provide, as well as other issues, I would agree with defense counsel that the burden of production, which is relatively slight, has been met, so that that presumption has been rebutted, but it is still a factor that I consider in this case.

The other -- of course, this case is different than a mere child pornography.  This is actual solicitation of

minors to engage in sexually explicit activity, which then resulted in videos being created, so it's an extremely serious case, as the parties are well aware. The Guidelines are enormous, and so that concerns me. I'm unclear about his treatment, with regard to what that treatment entails. Is there -- has a risk assessment been done, and if that's been done, what would that entail. So that's an outstanding concern that I have.

And then, Ms. Reynolds, I'm glad you mentioned something about the technology because the thing that does concern me, in the event that I would even consider release and possibly home incarceration, is access to the Internet. And my experience has been even in circumstances where I indicate that there should be no access, the Internet is so prevalent, it's very difficult for me to have any real assurance. And in a case such as this, where the danger to the community is based really in essence on his ability to access the Internet, unless I had some real significant assurance that that could be done, I don't believe that I could set conditions.

So at the present time, based upon the information I have, I agree with the government that he -- I don't agree he's a risk of flight. I think I can set conditions on that. I do agree that he's a danger to the community. Based upon the information that I have, I don't believe I could

reasonably set conditions.

I'm certainly willing, Ms. Reynolds, if you want to submit further information with regard to an evaluation of his condition.  I am cognizant of his nature of autism, but that doesn't help me as far as protecting the public.  I do have an obligation to protect him, as well, but my concern, based upon this conduct, it's extremely serious and I'm concerned about the risk that this could reoccur, and right now I don't see how I can set conditions.

So for those reasons, I am going to remand the defendant back to the custody of the United States Marshals pending further proceedings in this matter.

Ms. Reynolds, you and I had mentioned before -- I had discussed before about having a preliminary hearing in this matter.  Is that something that the defendant would like to do?

MS. REYNOLDS: Just very briefly, Your Honor.

(Counsel and Defendant confer.)

MS. REYNOLDS: Your Honor, at this time we would just waive the time that the -- sorry -- the time period with which the preliminary hearing would have to take place.  We would like to reserve the right to request one at a later time.

THE COURT:  All right.  Mr. Clark, any objection to that?

MR. CLARK:  No, thank you, Judge.

THE COURT:  All right.  So, Mr. Fishkind, I'll grant that request.  You are entitled to a preliminary hearing.  That's merely a hearing where I make a determination if there is probable cause to believe a crime has been committed and that you committed it.  So we will reserve your right to do that.  If you want a preliminary hearing at some point in time, all you need do is contact your counsel, she will contact me, and we'll set that up, unless there is some intervening act.  So that resolves that matter.

Is there anything further the government wishes me to address?

MR. CLARK:  No, thank you, Your Honor.

THE COURT:  I would note for the record, I did receive as part of the defense submissions two character letters, and I reviewed those prior to coming out.

Ms. Reynolds, anything further?

MS. REYNOLDS:  Nothing further.  Thank you.

THE COURT:  All right.  That marks the end of this matter.

COURTROOM DEPUTY:  Court is adjourned.

*    *    *

***CERTIFICATE OF OFFICIAL REPORTER***

I, **JACQUELYN BURKE GECEWICZ**, Federal Official Court Reporter, in and for the United States District Court for the Northern District of New York, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 6th day of June, 2025.

**/S/JACQUELYN BURKE GECEWICZ**

JACQUELYN BURKE GECEWICZ,
Official Court Reporter